WICKER, J.
*569 Appellant, Daniel Andrew Webb, seeks review of the trial court's January 13, 2016 community property partition judgment. On appeal, Mr. Webb assigns as error the trial court's classification of certain debts as his separate obligations and, relatedly, the denial of his reimbursement claims associated with payments made toward those debts after termination of the community. Mr. Webb further assigns as error the trial court's denial of his reimbursement claims for community use of his separate income generated from a Trust, as well as the denial of his rental reimbursement claim arising out of Mrs. Webb's exclusive use of the community home. For the following reasons, we reverse the trial court's judgment in part and affirm in part.
In her answer to the appeal, Elizabeth Webb alleges that the trial court erred in granting Mr. Webb's motion for new trial in part, finding that Mr. Webb is entitled to reimbursement from the community for one-half of the expenses related to their daughter's wedding. For the reasons discussed herein, we find that Mr. Webb is not entitled to reimbursement for those expenses and we reverse the trial court's granting of a new trial as to that issue.
Procedural History and Factual Background
Daniel Webb and Elizabeth Webb were married on December 29, 1972. During their marriage, the parties had three children: Craig, Preston and Pierce, all of whom have reached the age of majority. On March 6, 2012, after she discovered that Mr. Webb had fraudulently forged her signature on a home equity mortgage, resulting in a $250,000.00 loan encumbering the family home, Mrs. Webb filed a petition for divorce, requesting interim and final spousal support in addition to exclusive use of the family home and a partition of community property.
On May 31 2012, Mr. and Mrs. Webb stipulated to the Recommendations of the Hearing Officer that granted Mrs. Webb interim use and occupancy of the family home at 322 Hector Avenue in Metairie, and deferred to trial the issue of whether Mr. Webb would be entitled to rental reimbursement.
The community property partition trial was held on June 15, 2015, and July 27, 2015. At the center of the partition trial, and pertinent to this appeal, were the following issues: (1) whether a $250,000.00 First National Bank of Commerce (FNBC) loan-fraudulently executed without the approval of Mrs. Webb-should be classified as a separate or community obligation; (2) whether a $46,037.94 Capital One line of credit should be classified as a separate or community obligation; (3) whether Mr. Webb is entitled to reimbursement for: (a) payments Mr. Webb made after termination of the community toward the FNBC loan and the Capital One line of credit; (b)
*570 community use of his separate funds generated from a family trust; (c) the rental value for Mrs. Webb's exclusive use of the family home prior to partition; and (d) expenses paid from the FNBC loan funds related to Mr. and Mrs. Webb's daughter's wedding. Additional issues were determined at trial, such as the valuation of Mr. Webb's law firm, Sutterfield and Webb, as a community asset, as well as the calculation of tax liabilities, which are not at issue in this appeal.
During the two day trial, the following witnesses testified: Daniel Webb, Elizabeth Webb, Mark DeRouen, Albert Pappalardo, and Dale Fleishmann.[1]
The evidence presented at trial reflects that, during the course of their marriage, Mr. Webb took on a series of debts with multiple banks without notifying Mrs. Webb. Despite his contention that Mrs. Webb was aware of the debt incurred throughout their marriage, the record reflects that Mr. Webb took steps to hide his debt from his wife.[2] In his testimony, Mr. Webb acknowledged that he concealed from his wife a lawsuit filed against Mr. and Mrs. Webb after he defaulted on a $75,000.00 Capital One loan.[3] He testified that he requested that service of process on Mrs. Webb be waived, because he "didn't want her to know about the lawsuit."[4] Further, as discussed in more detail below, Mr. Webb additionally testified that he concealed from his wife a $250,000.00 FNBC loan, providing his office address on the FNBC documentation because he "probably" did not want his wife to know about the debt, and knew that Mrs. Webb absolutely would not have agreed to execute a home equity mortgage.
Concerning the FNBC loan, Mr. Webb testified that, on December 12, 2011, he executed a $250,000.00 loan with First NBC and that the funds were deposited into a newly created FNBC bank account in Mr. Webb's name only, opened on October 21, 2011. To secure this loan, Mr. Webb executed a home equity mortgage on the family home, securing indebtedness up to one million dollars in favor of FNBC. The record reflects, and Mr. Webb admits, that he fraudulently affixed Mrs. Webb's signature on the FNBC mortgage documents and intentionally concealed from Mrs. Webb the existence of the mortgage.
Mr. Webb testified that a portion of the $250,000.00 FNBC loan paid in full a previously executed, unsecured $120,000.00 loan balance, also with FNBC, which he incurred to satisfy past due federal tax obligations.[5] Additionally, Mr. Webb testified that a portion of the $250,000.00 FNBC loan funds were used to settle the Capital One lawsuit filed after he defaulted on the $75,000.00 loan, to pay Louisiana state taxes, and to pay the remaining portion of *571 the expenses related to his daughter's wedding.[6]
Concerning his claim for reimbursement for his separate funds used to satisfy community obligations, Mr. Webb testified that he received separate income from The Harold A. Webb Trust created by his father, Harold Webb, before his death. The Trust was created for the benefit of Harold Webb's children and grandchildren.[7] Pursuant to the terms of the Trust, according to Mr. Webb, the Trust was divided into equal shares to Mr. Webb, his siblings, his children, and his nieces and nephews.
Under the terms of Trust, Mr. Webb received a 1/8 interest and each of his three children received a 1/8 interest.[8] Mr. Webb testified that the Trust was established to pay for the tuitions of Harold Webb's grandchildren, and was used to pay for the children's summer camps as well as for the children's portion of the expenses for a family trip to Europe in 2000 to celebrate Mrs. Webb's fiftieth birthday.
Mr. Webb received income from the Trust from 1988 to 2000. In 1993, Mr. Webb filed a "Reservation of Income From Separate Property" to keep the Trust income as his separate property, which he "probably" did not disclose to his wife. Mr. Webb testified that the largest distributions he received from the Harold A. Webb Trust were in the years 1993 and 1994. The Webb's federal tax returns from 1993 and 1994 show that Mr. Webb earned $31,997.00 in 1993 and $20,322.00 in 1994 in dividend distributions from the Trust. Although Mr. Webb filed a Reservation of Income from Separate Property in 1993, he testified on the first day of trial that the income distributions from his father's Trust were not deposited into a separate bank account, and the money was used to enhance the community.
However, on the second day of trial, Mr. Webb changed his story and testified that he deposited the Trust income into a separate Smith Barney account that contained no community funds. In support of this assertion, Mr. Webb provided documents prepared by his expert, Mr. DeRouen, reflecting various deposits into the Smith Barney account, only for the years 1998-2001, totaling $221,070.88. Mr. Webb testified that the deposits into the Smith Barney account are his separate funds distributed from the Trust.
In her testimony, Mrs. Webb portrayed herself as a frugal woman who lives on a budget. Mrs. Webb testified that her father opened a separate bank account for her when she was in seventh grade, in which he regularly deposited funds, and she maintained that account as separate throughout her marriage. Following her father's advice, Mrs. Webb testified she never deposited any community funds into her separate bank account during her marriage.
The record reflects that, throughout the parties' thirty-nine year marriage, Mrs. Webb paid for various community expenses from her separate account. Mrs. Webb testified that she used her separate funds to pay for a portion of Mr. Webb's law school tuition, his credit card bills, a *572 $15,000.00 loan[9] executed by Mr. Webb and her medical bills after a miscarriage. Mrs. Webb testified that, at the time of trial, her separate bank account was almost completely depleted due to various expenses including: long-term health care,[10] property taxes, tax liabilities, and attorneys' fees.
During the marriage, Mrs. Webb was in charge of the household checking account and handled all household expenses for the Webb family. According to Mrs. Webb's testimony, she and Mr. Webb-to her knowledge-maintained two community bank accounts. One account was a money market account, where community funds were deposited to earn interest. The second was a joint checking account. Mrs. Webb testified that Mr. Webb would transfer money twice a month from the money market account into the joint checking account for Mrs. Webb to pay household bills. When business was doing well at Mr. Webb's law firm, he would make two monthly deposits, each approximately $8,500.00, into the joint checking account, which would be used exclusively for community expenses.
At trial, Mrs. Webb testified to her understanding that the Webbs' family home on Hector Avenue was free and clear of any mortgage or encumbrance, after she had made a final $13,000.00 payment in March of 2010. Mrs. Webb testified that she was completely unaware of the FNBC loan and the Capital One line of credit at issue in this appeal, and that she would have remained unaware of the FNBC home equity mortgage and loan had FNBC not inadvertently sent a copy of the loan document to the Webb family home. Mrs. Webb testified that in January of 2012-a week before her daughter's wedding-documentation from FNBC arrived by mail to the family home address. When she read the documents, Mrs. Webb noticed that the home address had been crossed out on the return address line on the mortgage application and had been replaced, in Mr. Webb's handwriting, with 650 Poydras Street-Mr. Webb's law firm's address. Sent with the mortgage was a card asking whether the Webbs needed a bankruptcy attorney-this correspondence also notified Mrs. Webb, for the first time, of the pending lawsuit Capital One filed against the Webbs for a separate loan in default. Mrs. Webb testified she read through the mortgage and noticed that her signature had been forged to the document. Mrs. Webb reluctantly decided to wait until after her daughter's wedding to ask Mr. Webb about the undisclosed mortgage, and other debts he may have incurred without her approval.
Approximately two days after her daughter's wedding, Mrs. Webb testified that she confronted Mr. Webb about the forged mortgage documents. At that time, Mr. Webb admitted to forging Mrs. Webb's signature on the FNBC documents and further informed Mrs. Webb of an additional $120,000.00 unsecured loan that Mr. Webb obtained without her knowledge, as well as undisclosed $50,000.00 and $75,000.00 lines of credit.[11] Mr. Webb told his wife that the $75,000.00 line of credit and the forged mortgage were "taken care of." Mr. Webb explained to her that he executed the $250,000.00 FNBC loan in *573 order to settle the pending Capital One lawsuit and to pay off other debts. After discovering the multiple lines of credit and loans that Mr. Webb executed without her knowledge or approval, Mrs. Webb filed for divorce on March 6, 2012.[12]
On May 30, 2012, Mrs. Webb filed an ethical conduct complaint with the Louisiana Office of Disciplinary Counsel ("ODC"), contending that Mr. Webb, a licensed Louisiana attorney, violated the Rules of Professional Conduct by forging her signature to both the FNBC mortgage documents as well as a 2010 IRS tax form. At trial, the record from the disciplinary proceeding was introduced into evidence.[13]
In the disciplinary record, Mr. Webb acknowledged his responsibility for forging Mrs. Webb's signature onto the FNBC mortgage application and also acknowledged he forged her signature to a later electronic request to the IRS for an extension to file federal income taxes.[14] In the ODC record, in an early correspondence between Mr. Webb's attorney and the ODC, Mr. Webb acknowledged the forgery, and stated that he would take steps to "make it right" by working with the lender to cancel the mortgage or, at the least, to remove Mrs. Webb from personal exposure for the loan.[15]
At trial, Mr. Webb vehemently denied that his statements to the Supreme Court and the ODC constitute judicial confessions sufficient to prove that he intended for the FNBC loan to be classified as his separate obligation. Mr. Webb testified that his statement promising to "make it right" related to his attempt to remove Mrs. Webb's name from the mortgage to avoid Mrs. Webb's personal exposure to the creditor, FNBC. Mr. Webb, however, testified that he stated clearly in his pleadings to the ODC that the $250,000.00 loan was, in fact, a community debt.
As to the Harold A. Webb Trust, Mrs. Webb testified that she knew of the Trust and knew that her husband and children were receiving distributions from the Trust regularly. However, she stated that Mr. Webb never allowed her access to the Trust and that she was unaware of the amount of income the Trust provided to Mr. Webb and their children. Mrs. Webb testified that she at some point asked for an account statement for her children's interest in the Trust, which Mr. Webb refused to provide.[16]
In support of his claim that all of the loans he received during the community were community obligations, Mr. Webb retained *574 Marc DeRouen, a certified public accountant ("CPA") and certified valuation analyst ("CVA"). Mr. DeRouen, accepted as an expert in divorce accountancy, testified that he evaluated the parties' assets and liabilities and created both a joint descriptive list as well as other documents reflecting the activity related to Capital One joint checking accounts as well as the $250,000.00 FNBC loan.[17]
Concerning the FNBC loan, Mr. DeRouen testified that the $250,000.00 loan was distributed by FNBC by direct payment of $120,000.00 to satisfy a prior, unsecured FNBC loan and a direct payment of $78,652.90 to Capital One to satisfy a separate unsecured loan. The remaining approximately $50,000.00 was deposited into an FNBC checking account in Mr. Webb's name.[18]
With regard to the $50,000 deposited into Mr. Webb's FNBC account, Mr. DeRouen traced the withdrawals from the FNBC bank account to community expenses. Of the $50,000.00 deposited into Mr. Webb's FNBC account, Mr. DeRouen testified that certain community expenses were paid, including a $29,655.95 check made payable to the New Orleans Country Club as a final payment for his daughter's wedding.
Concerning the $46,037.94 Capitol One line of credit at issue in this appeal, Mr. DeRouen testified briefly that Mr. Webb made payments toward satisfying that debt after termination of the community, and that Mr. Webb's one-half paid to be reimbursed by Mrs. Webb totaled $4,203.32. The parties stipulated to that amount at trial, but did not agree that the debt was a community obligation subject to reimbursement by Mrs. Webb. No bank statements or other documentation related to the $46,037.94 Capital One line of credit were introduced into evidence at trial.
Mr. DeRouen also testified concerning Mr. Webb's other reimbursement claims. Mr. DeRouen prepared a second document tracking the summary of activity from the Smith Barney bank account, the account in which Mr. Webb alleged he deposited the Trust income. The document tracked deposits and disbursements from the account, only from 1998 to the Trust's dissolution in 2001. Mr. DeRouen calculated the income Mr. Webb made from the Trust through tax returns and determined that $221,070.88 was deposited into the Smith Barney account which he testified was similar to the amount identified on Mr. Webb's tax returns as attributable to the Trust income.
According to Mr. DeRouen, the community expenses from 1998 to 2001 paid from the Smith Barney account totaled $206,881.48. However, in arriving at that figure of withdrawals from the Smith Barney account, Mr. DeRouen could only determine the amount of the withdrawals and to whom the payment was made. He could not testify with certainty whether the withdrawals were for community expenses, but stated that it "certainly [gave] the appearance generally of being community expenditures." Mr. DeRouen did not receive any cancelled checks or other documentation to prove that the money deposited into the Smith Barney account came from the Trust or, conversely, that the *575 money withdrawn from the Smith Barney account was used to benefit the community. Mr. Webb sought a reimbursement of half of his expenditures of his separate assets from the Smith Barney account used to satisfy community obligations-in his joint descriptive list, Mr. Webb sought a total of $84,720.00 in reimbursement.
Concerning Mr. Webb's request for rental reimbursement for Mrs. Webb's exclusive use of the family home, both Mr. and Mrs. Webb had experts present testimony regarding the overall value of the home and the expected rental value.
Mr. Albert Pappalardo testified as an expert real estate appraiser on behalf of Mrs. Webb.[19] Mr. Pappalardo conducted an appraisal of the Webb family home and determined the market value to be $825,000. To arrive at that valuation, Mr. Pappalardo compared the Webb family home to six properties-including one used by Mr. Webb's appraiser-that were similar in size, condition and location. It was Mr. Pappalardo's opinion that 322 Hector would have a rental value of $4,000.00 per month from 2012 to 2015.
Mr. Webb retained Dale Fleishmann, an expert real estate appraiser, to appraise the value of the Webb family home.[20] Ms. Fleishmann's 2014 appraisal valued the Webb family home at $950,000.00. In Ms. Fleishmann's opinion, the difference in value between Mr. Pappalardo's appraisal and his appraisal value was due to Ms. Fleishmann's choice of comparable houses closer in proximity to the Webb home, and his use of price per square foot comparable to the average in the area. Further, Ms. Fleishmann opined that the monthly rental value of the Webb home was $4,100.00 in 2014.
On January 13, 2016, the trial court issued a community property partition judgment, denying all of Mr. Webb's reimbursement claims and finding that the $250,000.00 FNBC loan and the Capital One line of credit are Mr. Webb's separate obligations.[21] In the court's Reasons for Judgment issued the same day, the court found that Mr. Webb "shall assume full responsibility" for the fraudulent FNBC loan and mortgage-finding that the statements made through his counsel to the Supreme Court during his disciplinary proceedings constituted a judicial confession, acknowledging the FNBC loan, as Mr. Webb's separate property. Additionally, the trial court found that Mr. Webb failed to meet the burden of proof to establish that the $46,037.00 Capitol One line of credit is a community obligation, and denied his reimbursement claim for payments made to satisfy that debt after the termination of the community. Further, the court denied Mr. Webb's reimbursement claim for the community's alleged use of his separate Trust income-finding that Mr. Webb failed to present evidence with sufficient particularity to be entitled to show that his separate income was used to satisfy community obligations. Finally, the court denied Mr. Webb's rental reimbursement claim, finding that an order requiring retroactive rental reimbursement would be extremely prejudicial to Mrs. Webb.
Mr. Webb filed a motion for new trial on January 26, 2016, which the court *576 granted in part on May 24, 2016. The court amended its January 13, 2016 judgment, and found that Mr. Webb was entitled to reimbursement of one-half of the $29,655.95 in expenses from his daughter's wedding-a reimbursement totaling $14,827.98. In the judgment, the court again denied Mr. Webb's rental reimbursement claim for Mrs. Webb's use of the family home, denied his reimbursement claims for payments made on the FNBC loan and Capitol One line of credit, and his reimbursement claim for the community's alleged use of Mr. Webb's separate Trust income.
Mr. Webb timely appealed the trial court judgments. Mrs. Webb filed an Answer to Appeal on October 11, 2016, alleging only that the trial court erred in granting Mr. Webb's motion for new trial in part as to his reimbursement claim for the expenses related to their daughter's wedding.
Law and Analysis
Classification of Obligations
On appeal, Mr. Webb first challenges the trial court's classification of two loans-the FNBC loan with a balance of $244,356.92 and the Capital One line of credit, with a balance of $46,037.00-as his separate obligations. Mr. Webb contends that both the FNBC loan and the Capital One line of credit are debts incurred during the community regime and, thus, are presumed to be community obligations. We address the classification of each loan in turn:
The FNBC Loan
In its January 13, 2016 judgment, the trial court found that the FNBC loan, with a remaining balance of $244,356.92, is a separate obligation for which the community is not responsible. In his Reasons for Judgment, the trial judge found that, "[i]n the Louisiana Supreme Court disciplinary proceedings against him, Mr. Webb through his counsel made declarations which establish that he assumed the First NBC loan as his separate obligation." The trial judge found that Mr. Webb's statements made in connection with the disciplinary proceedings constituted "a judicial confession as to the separate nature of this obligation," citing La. C.C. art. 1853.
On appeal, Mr. Webb contends that the trial court erred in finding that he judicially confessed, in connection with the disciplinary proceedings before the Louisiana Supreme Court, that the FNBC loan was a separate obligation for which he would be solely responsible. The record of the disciplinary proceeding was introduced into evidence at the partition trial. The documentation reflects that, on May 30, 2012, Mrs. Webb submitted an "Ethical Conduct Complaint" to the ODC. In her complaint, Mrs. Webb reported that she recently discovered that Mr. Webb fraudulently affixed her signature to an application for a home equity mortgage with FNBC, which would secure indebtedness in an amount up to $1,000,000.00 on their home, and subsequently obtained a $250,000.00 loan secured by that mortgage.
Mr. Webb initially responded to the ODC through correspondence dated July 12, 2012, and signed by his counsel. In his initial written response to the allegations against him, Mr. Webb essentially admitted the allegations against him, stating that he asked his secretary to affix Mrs. Webb's signature to the home equity mortgage and further asked his law partner to notarize the document. Mr. Webb stated in this initial correspondence that he would "make it right" and alleged that he had been "actively working with the lender to renegotiate the loan, cancel the home equity mortgage, and to remove his wife from any possible personal exposure associated with the underlying loan." On July 27, *577 2012, Mr. Webb forwarded additional correspondence to the ODC, further explaining the factual background of the parties and the "difficult, personal financial circumstances" surrounding the conduct at issue. Mr. Webb explained that Mrs. Webb refused to sign a renewal of a prior $75,000.00 line of credit,[22] and that he was faced with a pending lawsuit filed by Capital One against the Webbs arising from that loan. Mr. Webb explained that he obtained the $250,000.00 FNBC loan out of necessity and could not inform his wife because he feared she would then discover the pending Capital One lawsuit as well as an outstanding $120,000.00 IRS tax lien. In this July 27, 2012 correspondence, Mr. Webb acknowledged that his conduct violated the Louisiana Rules of Professional Conduct, but reasoned that "[h]is goal was to serve the interest of the community."
On August 24, 2012, Mrs. Webb submitted a supplemental complaint to the ODC with a copy of a "2010 IRS e-file Signature Authorization," allegedly reflecting her signature on the couple's 2010 tax forms. In her correspondence to the ODC, Mrs. Webb alleged that she did not authorize the signature and that Mr. Webb had, again, fraudulently caused her signature to be affixed to a document.
On September 24, 2012, Mr. Webb responded to Mrs. Webb's supplemental complaint, admitting to her allegations that he forged the 2010 IRS form and, again, explaining that he was "afraid to tell his wife" of the couple's difficult financial circumstances. However, Mr. Webb defended his actions by stating that the 2010 tax forms were accurate as filed and further that the filing of the tax return served the interest of the community.
Eventually, Mr. Webb and ODC stipulated to a Consent Discipline pursuant to Rule XIX, § 20. In the Joint Petition for Consent Discipline, Mr. Webb admitted to violating Rules for Professional Conduct and consented to a six-month suspension from the practice of law, deferred. In the "Stipulation of Facts" filed in those proceedings, Mr. Webb again acknowledged responsibility for forging Mrs. Webb's signature on the First NBC mortgage as well as the 2010 IRS tax form. In his Stipulation of Facts, Mr. Webb again contended that the First NBC loan was for the benefit of the community, more clearly stating that, "the home equity mortgage was obtained solely for the purpose of paying community debt incurred prior to the filing of the divorce petition" and, further, "the underlying debts were incurred for the benefit of the community."
Following the partition trial, the trial judge issued a judgment finding that the $250,000.00 FNBC loan was Mr. Webb's separate obligation. In his reasons for judgment, the trial judge found that Mr. Webb "made declarations which establish that he assumed the First NBC loan as his separate obligation." The trial judge determined that Mr. Webb's statements made in connection with the disciplinary proceedings were judicial confessions pursuant to La. C.C. art. 1853.
"A judicial confession is a declaration made by a party in a judicial proceeding." La. C.C. art. 1853. "That confession constitutes full proof against the party who made it." Id. A declaration that expressly acknowledges an adverse fact and is made by a party in a judicial proceeding is a judicial confession that constitutes full proof against the party who made it.
*578 Goines v. Goines , 08-42 (La. App. 5 Cir. 6/19/08), 989 So.2d 794, 797 (citations omitted). A judicial confession must be explicit and not merely implied. La Louisiane Bakery Co. v. Lafayette Ins. Co. , 09-825 (La. App. 5 Cir. 02/08/11), 61 So.3d 17, 26-27. Judicial confessions must be intentional waivers relating to the opponent's proof and not merely statements made for some independent purpose, such as for the purpose of providing testimony. Licciardi v. Licciardi , 16-289 (La. App. 5 Cir. 12/07/16), 207 So.3d 638, 641-42, writ denied , 17-0015 (La. 2/10/17), 210 So.3d 797. (quotations omitted).
Concerning admissions or statements made in separate proceedings, this Court has stated:
Admissions in proceedings other than the one currently being adjudicated are considered extrajudicial confessions or admissions. As such, they are evidence, but they do not create conclusive presumptions or operate as an estoppel against the party making them. The only instance where an extrajudicial confession will operate as an estoppel against the party making it is if the party claiming the benefit of the estoppel was deceived by the admission or relied on it to his prejudice. Douglas Oil Tools, Inc. v. Demesnil , 552 So.2d 77, 80 (La. App. 3rd Cir.1989) ; Financial Corporation v. Estate of Cooley , 447 So.2d 594, 600 (La. App. 3rd Cir. 1984).
Kaufmann v. Corp. Realty, Inc. , 99-1104 (La. App. 5 Cir. 4/12/00), 759 So.2d 969, 974.
In this case, the statements which the trial judge found to be judicial confessions are those Mr. Webb made in connection with his disciplinary proceedings before the Louisiana Supreme Court. Those statements or alleged confessions, however, occurred in a separate proceeding and, thus, cannot constitute judicial confessions as defined under La. C.C. art. 1853. However, the statements can be considered as probative evidence in any subsequent proceeding.
Nevertheless, while the statements can be considered, they cannot change the classification of the underlying debt unless, essentially, Mrs. Webb can prove that she relied on those statements to her detriment-meaning that she changed her position in reliance on Mr. Webb's statements to the Louisiana Supreme Court.
Mrs. Webb never testified that she relied on those statements to her detriment. Further, although Mr. Webb made several statements in the disciplinary proceedings, including that he "accepts responsibility" for his actions and that he "can and will pay it [the loan] off," Mr. Webb also never waivered, since the July 2012 inception of the disciplinary proceedings, that "his goal was to benefit the community" and "that the underlying debts were incurred for the benefit of the community." Accordingly, we find the trial court erred in finding that Mr. Webb's statements made in connection with the disciplinary proceedings constitute judicial confessions sufficient to serve as conclusive proof that the FNBC loan should be classified as Mr. Webb's separate obligation.
Therefore, because we find that the trial court applied the incorrect law in reaching its determination on the classification of the FNBC loan as a separate obligation, we conduct a de novo review of that issue on appeal. Upon our de novo review, and for the reasons herein, we find that the FNBC loan benefitted the community and, thus, is a community obligation.
Obligations incurred during the existence of the community are presumed to be community obligations. La. C.C. art. 2340. La. C.C. art. 2363 defines a separate obligation as follows:
*579 A separate obligation is one incurred prior to the establishment of a community property regime, or one incurred during the existence of a community property regime though not for the common interest of the spouses or for the interest of the other spouse.
An obligation resulting from an intentional wrong or an obligation incurred for the separate property of a spouse is likewise a separate
obligation to the extent that it does not benefit both spouses, the family, or the other spouse.
Comment (b) to this Article provides that, in determining whether an obligation arising from an intentional wrong is classified as a separate obligation, the focus of the analysis is not on the wrongful activity, but rather on the result of that activity and whether it benefitted the community. Comment (b) provides:
(b) Rather than focusing on a spouse's intent in committing an "intentional wrong," the second paragraph of this Article now focuses on whether the result of that wrong is to provide a benefit to the family.
Thus, under La. C.C. art. 2363, "[a]n obligation resulting from an intentional wrong that was perpetrated for the benefit of the community is therefore presumed to be community." Johnson v. Henry , 16-271 (La. App. 1 Cir. 10/31/16), 206 So.3d 916, 920 (Obligations arising out of wife's purchase of a computer through identity theft was a community obligation as the computer benefitted the community) (Compare Anderson-Dunham, Inc. v. Hamilton , 564 So.2d 823, 827 (La. App. 1st Cir. 1990), wherein the First Circuit determined that obligations arising from fraudulent activity, i.e. , embezzlement, which were used to maintain the husband's mistress were separate obligations).
In this case, the record reflects that the FNBC loan was incurred on December 11, 2011, during the existence of the community regime. The expert testimony presented at trial, as well as the documentation related to the FNBC loan, reflect that the FNBC loan, although resulting from an intentional wrong-Mr. Webb's forgery of Mrs. Webb's signature-benefitted the community by satisfying community debts.
Marc DeRouen, an expert in divorce accountancy, testified concerning the FNBC loan at issue. Mr. DeRouen testified that the entire $250,000.00 FNBC loan was expended on community property obligations. The FNBC loan documentation reflects that, from the $250,000.00 loan, FNBC paid to Capital One a total of
$78,632.89 to pay off an existing loan incurred during the community. The FNBC document further reflects that $120,000.00, from the $250,000.00, was disbursed to pay off a prior FNBC loan, loan #1000048141, which was also incurred during the community. Mr. Webb testified that he took out the $120,000.00 FNBC loan to satisfy community tax obligations. The record reflects that within days of Mr. Webb executing the previous $120,000.00 FNBC loan, he issued a check to the Department of Treasury for $117,537.00, and a separate check for $1,433.00 to the Louisiana Department of Revenue. Both checks have a notation indicating that the payment was made for 2010 taxes.
Regarding the remaining $50,000.00 balance from the $250,000.00 FNBC loan, Mr. DeRouen testified that a $20,000.00 disbursement from the FNBC loan to Mr. Webb's FNBC checking account was made on January 17, 2012, and a $30,000.00 transfer from the $250,000.00 FNBC loan account to the FNBC checking account was made on February 7, 2012. Mr. DeRouen testified that these two disbursements *580 were used towards various community expenses, including a $29,655.95 check to the New Orleans Country Club for a payment on Mr. and Mrs. Webb's daughter's wedding. Mrs. Webb failed to put forth any evidence to prove that any of the $250,000.00 FNBC loan was used by Mr. Webb as his separate property.
Therefore, although obtained through fraudulent means, Mrs. Webb failed to prove that the monies obtained through the $250,000.00 loan did not benefit the community. Mr. Webb, on the other hand, put forth documentary and expert testimony to trace the funds and show that they were used to satisfy community obligations and to overall benefit the community. Thus, pursuant to La. C.C. art. 2363, the FNBC loan is a community obligation. Accordingly, we reverse that portion of the trial court judgment classifying the FNBC loan as Mr. Webb's separate obligation.
Relatedly, Mr. Webb seeks review of the trial court's denial of his reimbursement claim for payments Mr. Webb made toward the FNBC loan post-termination of the community. At trial, Mr. Webb introduced into evidence the FNBC loan statements, reflecting that Mr. Webb made payments on the loan post-termination of the community and that his one-half to be reimbursed from Mrs. Webb totaled $21,216.64.[23] Because we find that the FNBC loan is a community obligation, Mr. Webb is entitled to reimbursement for the payments he made after termination of the community pursuant to La. C.C. art. 2365.[24] See also Roger v. Roger , 99-765 (La. App. 5 Cir. 1/12/00), 751 So.2d 354. Accordingly, we reverse that portion of the trial court judgment denying Mr. Webb's reimbursement claim related to post-termination payments Mr. Webb made on the FNBC loan, and find that Mr. Webb is entitled to reimbursement from Mrs. Webb for one-half of those payments made.
The Capital One Line of Credit
Mr. Webb further assigns as error the trial judge's classification of the Capital One line of credit as his separate obligation. In his Reasons for Judgment, the trial judge found that Mr. Webb was not entitled to the presumption that the Capital One line of credit is a community obligation. Specifically, the trial judge found, "Mr. Webb failed to prove that the $46,037.94 Capital One line of credit is a community obligation...Mr. Webb failed to present evidence establishing that this line of credit was taken out during the marriage or that the claimed $46,037.94 was drawn down from the credit line during the marriage."[25]
Upon review of the record in this case, we cannot say that the trial court erred in finding that Mr. Webb failed to meet his burden to prove that the Capital one line of credit is a community obligation. La. C.C. art. 2361 provides generally that, "all obligations incurred by a spouse during the existence of a communi ty property regime *581 are presumed to be community obligations." (emphasis added). For this presumption of community to apply, one must, at minimum, demonstrate through competent evidence that the obligation at issue was incurred "during the existence of a community property regime."[26] In her post-trial memorandum, Mrs. Webb pointed out that Mr. Webb failed to present any evidence related to the Capital One line of credit, such as bank statements or canceled checks. A review of the record supports Mrs. Webb's position.
The record reflects that the only documentation introduced into evidence concerning the Capital One line of credit, designated as an account "ending in 03017," is a one-page document created by Mr. DeRouen reflecting only post-termination payments made toward the line of credit. The document does not reflect the date of loan origination, the initial loan balance, the balance at the time of trial, or a delineation of any payments or disbursements made during the existence of the community. Although Mr. Webb's testimony indicates that the Capital One line of credit at issue was established in the 1990s during the community, there is no documentary evidence or testimony to prove when the actual debt was incurred, i.e. the date on which any draws from the line of credit were made.[27] Accordingly, we find that Mr. Webb is not entitled to the presumption of community provided in La. C.C. art. 2361 and further find that he failed to prove that the debt was a community obligation. Accordingly, we cannot say that the trial court erred in classifying the Capital One line of credit as Mr. Webb's separate property, given the complete lack of evidence presented at the partition trial.[28]
Reimbursement Claims
Reimbursement Related to Trust Funds
Mr. Webb further assigns as error the trial court's denial of his reimbursement claim for community use of separate property generated by his interest in his father's Trust. According to the testimony of Mr. Webb, his father, Harold Andrew Webb, created a Trust for the benefit of his children and grandchildren before his death in 1987. Mr. Webb received Trust distributions from 1988 until the termination of the Trust in 2000 or 2001.
Mr. Webb's expert witness in divorce accountancy, Mr. DeRouen, testified that *582 he reviewed only documentation provided to him from Mr. Webb related to the Trust and a Smith Barney account. Mr. DeRouen testified to multiple deposits made into the Smith Barney bank account from 1998 to 2001. However, no cancelled checks or other documentation from the Harold A. Webb Trust were introduced into evidence to prove that the funds deposited into the Smith Barney account were in fact income from the Trust.
Further, the documentation created by Mr. DeRouen reflecting the checks issued and payments made from the Smith Barney account only shows the amount of the check and the payee. However, when asked whether the funds were used for community purposes, Mr. DeRouen testified he based his conclusion that expenses were for community purposes on Mr. Webb's oral assurances, which "certainly [gave] the appearance generally of being community expenditures." According to Mr. DeRouen, Mr. Webb spent $206,881.48 of separate property generated by his father's Trust from 1998 to 2001.
As to Mr. Webb's claim for reimbursement, the trial court found that Mr. Webb failed to present evidence with sufficient particularity to establish that separate funds were used to pay community debts. Mr. Webb, on appeal, contends that the trial court erroneously denied his reimbursement claim for community use of separate property generated by his interest in his father's Trust. Mr. Webb further alleges that he met his burden of proof to establish that the Trust funds were used to pay community expenses, asserting that Mr. DeRouen's testimony accounted for "every penny" of his separate funds, therefore the funds should be reimbursed.
As a general rule, Trust income is community property. See La. C.C. art. 2339. Trust income belongs to the community unless a spouse files a reservation of fruits of separate property as "natural and civil fruits of the separate property of a spouse ... are community property." Id. A reservation of fruits from a separate asset ensures that the fruits of the property remain separate property of the declaring spouse. Id. In 1993, when Mr. Webb filed his reservation of fruits, the law required the reservation to be executed in an authentic act or in an act under private signature duly acknowledged. La. C.C. art. 2339 (1993). For the reservation to be enforceable, the law required it to be filed in the conveyance records where the declarant is domiciled. Id. Mr. Webb executed a reservation of income from separate property in authentic form on February 3, 1993, which was filed with the Jefferson Parish Clerk of Court. Therefore, the income from his father's Trust is his separate property.[29]
A trial court has broad discretion in adjudicating issues raised during a partition of community property. Dublan v. Dublan , 06-296 (La. App. 5 Cir. 11/28/06), 947 So.2d 759, 762 (citing Sherrod v. Sherrod , 97-907 (La. App. 5 Cir. 3/25/98), 709 So.2d 352, writ denied , 98-1121 (La. 6/5/98), 720 So.2d 687 ). The trial judge in a community property partition is given a large degree of latitude in arriving at an equitable distribution of assets between the spouses. Id. (citing Kambur v. Kambur , 94-775 (La. App. 5 Cir. 3/1/95), 652 So.2d 99 ). An appellate court shall not *583 disturb a factual finding made by the trial court absent manifest error or a clearly erroneous finding. Id. (citing Sherrod , 709 So.2d at 352 ).
La. C.C. art. 2365 governs reimbursement for separate property used to satisfy community debts. It provides:
If separate property of a spouse has been used either during the existence of the community property regime or thereafter to satisfy a community obligation, that spouse is entitled to reimbursement for one-half of the amount or value that the property had at the time it was used.
If the community obligation was incurred to acquire ownership or use of a community corporeal movable required by law to be registered, and separate property of a spouse has been used after termination to satisfy that obligation, the reimbursement claim shall be reduced in proportion to the value of the claimant's use after termination of the community property regime. The value of that use and the amount of the claim for reimbursement accrued during the use are presumed to be equal.
The liability of a spouse who owes reimbursement is limited to the value of his share of all community property after deduction of all community obligations. Nevertheless, if the community obligation was incurred for the ordinary and customary expenses of the marriage, or
for the support, maintenance, or education of children of either spouse in keeping with the economic condition of the spouses, the spouse is entitled to reimbursement from the other spouse regardless of the value of that spouse's share of all community property.
La. C.C. art. 2365.
A spouse claiming reimbursement must conclusively prove that separate funds existed and that the separate funds were used for the benefit of the community. Licciardi v. Licciardi , 207 So.3d at 642 ; Dublan , 947 So.2d at 762 (citing Rogers v. Rogers , 94-541(La. App. 5 Cir. 12/9/94), 649 So.2d 7 ).
La. C.C. art. 2340 creates a presumption that property in the possession of a spouse during the existence of a community property regime is community property. La. C.C. art. 2340. Therefore, without compelling proof that the funds were indeed separate, and how the separate funds were used, the claim for reimbursement must be denied. Licciardi , 207 So.3d at 642 (citing Bourgeois v. Bourgeois , 09-986 (La. App. 5 Cir. 3/23/10), 40 So.3d 150, 155 ; Succession of Blythe , 496 So.2d 1180, 1183 (La. App. 5 Cir. 1986), writ denied , 498 So.2d 15 (La. 1986). See also Fulco v. Fulco , 50,256 (La. App. 2 Cir. 11/18/15), 183 So.3d 573, 577 (citing Succession of Norwood v. Norwood , 519 So.2d 338 (La. App. 2 Cir.), writ denied , 521 So.2d 1169 (La. 1988) ; Sharp v. Sharp , 01-0969 (La. App. 4 Cir. 10/02/02), 830 So.2d 328, 330 (finding that "[t]he standard of proving that an asset is separate is strict, clear, positive and legally certain.") (citing Martinez v. Martinez , 556 So.2d 668 (La. App. 4 Cir. 1990).
Upon review of the record, Mr. Webb failed to prove that his separate Trust was used for community purposes to support his claim for reimbursement. Here, the only evidence that $206,881.48 was separate property generated by the Harold A. Webb Trust, and spent by Mr. Webb for the benefit of the community, is Mr. Webb's testimony and Mr. DeRouen's assertion that the expenditures "certainly [gave] the appearance generally of being community expenditures." Mr. Webb has the burden of providing compelling proof that separate funds were available and were used to satisfy community obligations. Licciardi , 207 So.3d at 642. Mr. *584 Webb does not include any documentation-such as cancelled checks or statements from the Harold A. Webb Trust account-to show that the funds deposited in Mr. Webb's Smith Barney account from 1998 to 2001 were funds derived from the Trust, and thus, his separate property. Further, Mr. Webb failed to provide compelling proof that those funds were used to benefit the community. We find that, on the record before us, Mr. Webb failed to present sufficient evidence to rebut the presumption to show that he is entitled to reimbursement. See Licciardi , 207 So.3d at 642. Given the facts presented at trial, we find the court did not abuse its discretion in denying Mr. Webb's reimbursement claim for the community's alleged use of separate property earned from his father's Trust.
Rental Reimbursement
Mr. Webb further assigns as error the trial court's denial of his deferred rental reimbursement claim for Mrs. Webb's exclusive use of the family home. The record reflects that Mrs. Webb has had exclusive use of the community home since April 13, 2012.[30] According to Mr. Webb's real estate expert the expected rental value of the home would be $4,100 per month. Mrs. Webb's real estate expert testified the rental of the home would be $4,000 per month. In denying Mr. Webb's claim for rental reimbursement, the trial court found that a deferred rental claim would be extremely prejudicial to Mrs. Webb, who only receives $5,000.00 in monthly spousal support, and who, since termination of the community, had incurred significant medical expenses related to cancer treatment.
La. R.S. 9:374(C) provides for the possession and use of the family residence pending a partition of community property. The statute provides:
A spouse who, in accordance with the provisions of Subsection A or B of this Section, uses and occupies or is awarded by the court the use and occupancy of the family residence, a community immovable occupied as a residence, or a community manufactured home as defined in R.S. 9:1149.2 and occupied as a residence, regardless of whether it has been immobilized, shall not be liable to the other spouse for rental for the use and occupancy, except as hereafter provided. If the court awards use and occupancy to a spouse, it shall at that time determine whether to award rental for the use and occupancy and, if so, the amount of the rent. The parties may agree to defer the rental issue for decision in the partition proceedings. If the parties agreed at the time of the award of use and occupancy to defer the rental issue, the court may make an award of rental retroactive to the date of the award of use and occupancy.
La. R.S. 9:374 (C). Under the statute, the parties may agree to defer the issue of rental reimbursement until the partition of community property. Id.
The seminal case regarding rental reimbursement is the Louisiana Supreme Court's decision in McCarroll v. McCarroll , 96-2700 (La. 10/21/97), 701 So.2d 1280. In McCarroll , the Court resolved a circuit split among Louisiana Circuit Courts of Appeal regarding whether a spouse could be awarded rental reimbursement after an order of use and occupancy of the family home had been entered. Id. at 1289. The court in McCarroll found that rental reimbursements *585 may not be retroactively assessed unless ordered by the court or agreed by the spouses at the time the spouses agreed on occupancy of the home. Id. See also Bourgeois v. Bourgeois , 09-106 (La. App. 5 Cir. 6/23/09), 16 So.3d 431, 436 ; Saacks v. Saacks , 05-365 (La. App. 5 Cir. 9/26/06), 942 So.2d 1130, 1139. Public policy weighed heavily on the court's decision to read the statute to restrict the award of retroactive rental reimbursement stating that "when the community is not partitioned for many years, the retroactive assessment of rent is extremely prejudicial to the occupying spouse. Such retroactive assessment deprives the occupying spouse of the ability to make an informed and meaningful decision regarding his or her finances and housing budget. There is no corollary prejudice to the nonoccupying spouse under this interpretation of the statute, since that spouse has the ability to invoke a court proceeding to determine occupancy and rent at any time." Id. at 1290 (citing La. C.C. art. 105 ).
La. R.S. 9:374 (C), amended in 2009, now requires an award of occupancy or use of the community home and the parties express agreement to defer the issue of rental reimbursement to trial. Id. ; Saacks , 942 So.2d at 1139 ; Richard , 762 So.2d at 274 (citing Lupberger v. Lupberger , 99-0144 (La. App. 4 Cir. 6/16/99), 738 So.2d 138, 140 ).
The record reflects the Webbs agreed to defer the issue of rental reimbursement for Mrs. Webb's use of the family home until trial. In the May 30, 2012 Stipulations and/or Recommendations of the Hearing Officer, Mr. and Mrs. Webb agreed Mrs. Webb would occupy the home, and clearly agreed to defer the issue of rental reimbursement to trial. The Stipulations and/or Recommendations of the Hearing Officer was signed by the parties, the hearing officer, and district court judge on May 31, 2012.
When the parties agree to defer the issue of rental reimbursement, the court must hold a contradictory hearing pursuant to La. R.S. 9:374 to determine rental reimbursement. See Richard , 762 So.2d 275. According to La. R.S. 9:374(C), the court in determining use and occupancy of the family home must:
inquire into the relative economic status of the spouses, including both community and separate property, and the needs of the children, if any, and shall award the use and occupancy of the family residence and the use of any community movables or immovables to the spouse in accordance with the best interest of the family. If applicable, the court shall consider the granting of the occupancy of the family residence and the use of community movables or immovables in awarding spousal support.
La. R.S. 9:374 (B).
The Louisiana Supreme Court has interpreted La. R.S. 9:374 to allow courts to consider the relative economic status of the parties, the needs of the children, and the effect of the award of occupancy in addition to the prejudice to the nonoccupying spouse to determine whether a spouse must pay rental reimbursement for exclusive use of the community home. McCarroll , 701 So.2d at 1290 ; see also Richard , 762 So.2d at 275. In community property disputes, the trial court has vast discretion over whether to assess rental payments. McCarroll , 701 So.2d at 1298 ; Sequeira v. Sequeira , 04-433 (La. App. 5 Cir. 11/30/04), 888 So.2d 1097, 1103, writ denied , 05-0350 (La. 4/29/05), 901 So.2d 1065.
The record reflects a factual basis for denying Mr. Webb's rental reimbursement claim. The financial standing of the *586 parties is disparate; Mr. Webb earns approximately $20,000.00 per month from his law practice while Mrs. Webb receives $5,000.00 a month in final spousal support. Further, the record reflects that, Mrs. Webb is at a diminished earning capacity. She is qualified to be a teacher-she taught from 1972 to 1979, from 1993 to 1997, and for a semester in Baton Rouge after Katrina in 2006-but her primary obligation during her marriage was raising her three children. Additionally, Mrs. Webb was diagnosed with breast cancer during the partition proceedings, and incurred between $7,000.00 to $10,000.00 of medical bills that were not covered by insurance-all paid from her separate funds. The trial court's denial of Mr. Webb's rental reimbursement claim is supported by the facts and is within the trial court's vast discretion in determining whether to award rental reimbursement. McCarroll , 701 So.2d at 1298. This assignment has no merit.
Answer to Appeal
Mrs. Webb has filed an Answer to Mr. Webb's appeal, contending that the trial court erred in granting Mr. Webb's motion for new trial as it related to his reimbursement claim for one-half of the $29,655.95 in expenses related to their daughter's wedding, which was paid from the FNBC loan funds at issue in this appeal. However, because we have, upon our de novo review, found that the FNBC loan is a community obligation, rather than Mr. Webb's separate obligation, we find as a matter of law Mr. Webb is not entitled to reimbursement for payments made toward a community expense (the wedding) from community funds, the FNBC funds. Therefore, we reverse that portion of the trial court judgment[31] granting Mr. Webb's reimbursement claim for one-half of the expenses related to Mr. and Mrs. Webb's daughter's wedding, or $14,827.98.
Conclusion
Accordingly, for the reasons provided herein, we reverse that portion of the trial court's January 13, 2016 judgment classifying the FNBC loan at issue as a separate obligation and in denying Mr. Webb's reimbursement claim for post-termination payments made to the FNBC loan. We further reverse that portion of the trial court's May 24, 2016 judgment granting Mr. Webb's reimbursement claim related to the parties' daughter's wedding expenses. In all other respects, we affirm.
AFFIRMED IN PART; REVERSED IN PART

Craig Silva and Bruce Miller also testified as experts in tax liability, which is not at issue in this appeal.

Mr. Webb has a history of making and defaulting on loans or lines of credit of which Mrs. Webb had no knowledge. He testified that he defaulted on a $15,000 loan, which Mr. Webb believed was subsequently paid by Mrs. Webb from her separate property. Additionally, in 1999, Mr. Webb defaulted on a $10,000 loan, which was also subsequently paid by Mrs. Webb from her separate property.

The $75,000.00 Capital One loan is separate and apart from the $46,037.94 Capital One line of credit at issue in this appeal.

The Capitol One petition filing suit against Mr. and Mrs. Webb was not introduced into evidence at trial.

The record reflects Mr. Webb executed a check to the United States Department of the Treasury for $117,537.00 on October 17, 2011.

Mr. Webb testified that the final balance he paid for his daughter's wedding at the New Orleans Country Club was $29,655.95.

Mrs. Webb testified that the Harold Webb Trust fund was set up for the children's "educational needs, camp needs, colleges, cars, any of the needs, their trips, any kind of study abroad or anything like that."

The Trust document was not entered into evidence at trial.

Mrs. Webb testified that she was unaware of this loan before it became due.

During the divorce proceedings, Mrs. Webb was diagnosed with breast cancer. She had a double mastectomy, four months of chemotherapy, surgeries, and biopsies.

Mrs. Webb also testified Mr. Webb notified her at that time about a $46,000.00 American Express Bill and a car loan of which she was unaware. Neither of those debts are at issue in this appeal.

Mrs. Webb testified she did not tell Mr. Webb of her divorce petition, because Mr. Webb had threatened if she exposed his wrongdoing "he would make [her] pay for the rest of [her] life and that [she] wouldn't be able to prove that he had forged [her] name."

Mrs. Webb previously filed suit against Mr. Webb and his law firm, Sutterfield & Webb, LLC, for damages arising out of the forged FNBC loan, contending that Sutterfield & Webb was liable for the actions of its attorney-notary, Scott Winstead, employed by the law firm. See Webb v. Webb , 14-422 (La. 11/25/14), 165 So.3d 157.

The record admitted at trial included correspondence between Mr. Webb's counsel, Phelps Gay, and the Office of Disciplinary Counsel dated July 12, 2012 and July 27, 2012.

Mr. Webb requested a six-month deferred suspension, which was accepted by the Louisiana Supreme Court. See In Re Webb , 13-2583 (La. 12/6/13), 129 So.3d 526.

For example, Mrs. Webb learned that Mr. Webb had withdrawn $5,000.00 from each of the children's interest in the Trust for a trip to Europe in 2000, and voiced her opinion that she was against it. However, other than the trip to Europe, Mrs. Webb did not indicate that the trust income had been used in a manner inconsistent with the Trust's goal of paying for the children's education.

Mrs. Webb did not object to Mr. DeRouen's qualifications in the area of divorce accountancy, Mr. DeRouen testified that he has testified in "hundreds" of divorce cases and has qualified as an expert in all five Louisiana appellate jurisdictions. Mr. DeRouen was also qualified as an expert to testify regarding the value of Mr. Webb's law firm, Sutterfield & Webb. The valuation of the firm is not assigned as error in this appeal.

Mrs. Webb testified that she did not know the FNBC checking account existed.

The parties stipulated to Mr. Pappalardo's credentials to testify as an expert witness in real estate appraisal, and to the admissibility of Mr. Pappalardo's expert report.

The parties likewise stipulated to Ms. Fleishmann's qualifications as an expert in the field of real estate appraisal, and to the admissibility of his report.

The judgment also determined other issues, not relevant to this appeal.

This $75,000.00 Capital One line of credit is separate and apart from the $46,037.00 line of credit at issue in this litigation.

Mrs. Webb stipulated to the accuracy of the amount Mr. Webb paid to FNBC. However, Mrs. Webb contended that Mr. Webb was not entitled to reimbursement for payments made on the FNBC loan because the loan is Mr. Webb's separate obligation.

La. C.C. art. 2365, in pertinent part, provides:
If separate property of a spouse has been used either during the existence of the community property regime or thereafter to satisfy a community obligation, that spouse is entitled to reimbursement for one-half of the amount or value that the property had at the time it was used.

In the detailed descriptive list, Mrs. Webb listed the Capital One line of credit, "ending in 03017," as Mr. Webb's separate obligation.

La. C.E. art. 302 defines presumption as:
A "presumption" is an inference created by legislation that the trier of fact must draw if it finds the existence of the predicate fact unless the trier of fact is persuaded by evidence of the nonexistence of the fact to be inferred. As used herein, it does not include a particular usage of the term "presumption" where the content, context, or history of the statute indicates an intention merely to authorize but not to require the trier of fact to draw an inference.
The Article further defines a "predicate fact" as:
A "predicate fact" is a fact or group of facts which must be established for a party to be entitled to the benefits of a presumption.

Mr. DeRouen also testified to an "old" line of credit that he indicated was established in approximately 1998. Mr. DeRouen acknowledged that Mr. Webb took two "draws" from the line of credit after the termination of the community but did not testify to the balance on the line of credit during the community or the outstanding balance at the time of the termination of the community. Mr. DeRouen did not review any bank statements or other documentary evidence concerning that line of credit and relied upon the information Mr. Webb relayed to him.

Relatedly, Mr. Webb seeks review of the trial court's denial of his reimbursement claim for payments he made toward the Capital One line of credit after termination of the community. However, because we find that the Capital One line of credit is not a community obligation, Mr. Webb is not entitled to reimbursement for payments he made on his separate obligation.

La. C.C. art. 2339 provides that a spouse may reserve the fruits of separate property as his separate property so long as it is executed in an authentic act and presented to the other spouse before filing the document in the public record. However, prior to a 2008 amendment to Article 2339, notice to the other spouse was not required. See Acts 2008, no. 888.

According to the joint descriptive list, Mr. Webb valued the home at $950,000.00 and Mrs. Webb valued the home at $825,000.00.

The trial court initially denied Mr. Webb's reimbursement claims in its January 13, 2016 judgment. However, after consideration of Mr. Webb's motion for new trial on various issues, the trial judge granted Mr. Webb's motion for new trial in part as it related to his claim for reimbursement related to wedding expenses. In its May 24, 2016 judgment, the trial court granted Mr. Webb reimbursement for one-half of the wedding expenses at issue, or $14,827.98. We reverse that portion of the May 24, 2016 judgment.